FILE COPY: MAY 23, 2008
08CV3028   SLA
JUDGE NORGLE
MAGISTRATE JUDGE NOLAN

## IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF ILLINOIS

SCAN COIN INDUSTRIES, AB,
a Swedish Corporation

                    Petitioner,

      v.

COINSTAR, INC., a Delaware corporation,

                    Respondent.

## APPLICATION TO CONFIRM ARBITRATION AWARD
## AND FOR ENTRY OF JUDGMENT

COMES NOW, Scan Coin Industries, AB, ("Scan Coin Industries") and hereby files this Application to Confirm Arbitration Award and for Entry of Judgment pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* In support of its Application, Scan Coin Industries shows that it has attached hereto the Declaration of Rickard Ovin (the "Declaration"), to which are attached true and authentic copies of original documents from the Arbitration Proceeding, including the May 8, 2008 Separate Award on Costs (the "Separate Award on Costs") and the Agreement of April 30, 1993 between plaintiff Coinstar, Inc. (formerly Skydeck Corporation) and Scan Coin AB, parent company of Scan Coin Industries, as well as other materials related to this Application. Mr. Ovin verifies the accuracy and authenticity of the Agreement and the Arbitration Award and other materials. In further support of its Application, Scan Coin respectfully shows this Court as follows:

1.      Scan Coin Industries applies for the confirmation of the Separate Award on Costs ordered by the Arbitral Tribunal of the Arbitration Institute of the Stockholm Chamber of Commerce, pursuant to 9 U.S.C. §§ 9, 13, and 207 and for entry of a judgment thereon pursuant to 9 U.S.C. §§ 13 and

207.  A true and accurate copy of the Separate Award on Costs is attached as **Exhibit B** to the

Declaration.  This application in no way deprives the Arbitration Proceeding of continuing to hold

hearings and decide the merits of the parties dispute, but merely seeks to enforce the Separate Award

on Costs by which the Arbitration Panel has ruled that Coinstar must reimburse Scan Coin Industries

for the fees of the Arbitration which Scan Coin Industries advanced on behalf of Coinstar to enable

the proceeding to go forward.   In addition, as hereinafter set forth, Coinstar is required to pay

interest on the amount advanced on its behalf by Scan Coin Industries.


2.      Scan Coin Industries is a corporation organized under the laws of Sweden.  Scan Coin

Industries' principal place of business is located in Malmö, Sweden.


3.      Coinstar Corporation ("Coinstar") is a corporation organized under the laws of the state

Delaware.  Coinstar's principal place of business is located in Bellevue, Washington


4.      This Court has jurisdiction over this Application to Confirm Arbitration under 28 U.S.C. §

1331 and 9 U.S.C. § 203.


5.      This Court is a proper venue for this Application to Confirm Arbitration Award under 9

U.S.C. § 204.


6.      Coinstar is a party to a related litigation against Scan Coin North America, Inc., a sister

company of Scan Coin Industries.  The litigation between Coinstar and Scan Coin North America,

Inc. is currently pending before Judge Norgle in this judicial district (*Coinstar, Inc. v. Scan Coin*

*North America, Inc., et. al.* 1:07-cv-5285).  Scan Coin Industries has intervened in that action and

filed a motion to stay that proceeding pending final determination of the ongoing arbitration in

Sweden in which the Separate Award of Costs was entered.


7.     Scan Coin Industries, formerly known as Scan Coin AB, and Coinstar, formerly known as

Skydeck Corporation, entered into an Agreement on April 30, 1993 regarding the manufacture, sale,

and development of Scan Coin Industries' coin validation and counting units for use in coin deposit

machines  (the "Agreement").  The Agreement was amended on September 1, 1994 and February 15,

1995.  A true and accurate copy of the Agreement and its two amendments is attached as **Exhibit A**

to the Declaration of Mr. Ovin.


8.     Article 20.2 of the Agreement includes an arbitration provision, which specifically states that

> Any dispute, controversy or claim arising out of or in connection with this
> Agreement, or the breach, termination or invalidity thereof, shall be settled by
> arbitration in accordance with the Rules of the Arbitration Institute of the
> Stockholm Chamber of Commerce.


9.     On April 10, 2007, Scan Coin Industries initiated arbitration against Coinstar by filing a

Request for Arbitration before the Arbitration Institute of the Stockholm Chamber of Commerce (the

"Arbitration Institute") pursuant to the provisions of Article 20.2 of the Agreement.


10.     On June 1, 2007, the Arbitration Institute informed the parties that the parties jointly owed an

Advance on Costs in the amount of € 413, 600.  Scan Coin Industries was credited for the filing fee

paid at the time of filing the Request for Arbitration, and, therefore Scan Coin Industries' portion of

the Advance on Costs was calculated at € 204, 925.  Coinstar owed € 206, 800, the remaining

balance of the Advance on Costs.  Scan Coin Industries paid the full amount of its portion of the

Advance on Costs; however, Coinstar paid only € 50,000.

11.     The Arbitration Institute offered to allow Scan Coin Industries to pay the unpaid balance of

the Advance on Costs owed by Coinstar in the amount of € 156, 800.  Scan Coin Industries paid

Coinstar's outstanding balance.  On August 30, 2007, Scan Coin Industries submitted a Statement of

Claim that included a Request for Separate Award specifically seeking remuneration from Coinstar

for its unpaid portion of the Advance on Costs paid by Scan Coin Industries and interest.  This

Statement of Claim sought an interim payment of the remaining half of Coinstar's arbitration fees

that had been advanced by Scan Coin plus interest as allowed by Swedish law.


12.     A procedural conference was held before the Arbitral Tribunal of the Arbitration Institute on

February 26, 2008, at which both Scan Coin Industries and Coinstar presented arguments before the

Arbitral Tribunal relating to the Statement of Claim.


13.     The Arbitral Tribunal of the Arbitration Institute issued a Separate Award on Costs on May

8, 2008, stating that "Coinstar is ordered to pay forthwith to Scan Coin Industries AB the sum of

EUR 156 800 and interest thereon according to section 6 of the Swedish Interest Act from the 6th

July 2007 until payment has been made in full." Separate Award on Costs, p. 16.


14.     The Separate Award on Costs authorizes Scan Coin to collect the funds it advanced toward

Coinstar's arbitration fees plus interest, while the Arbitration continues on the merits.  The Separate

Award does not constitute the Arbitration Tribunal's final adjudication of the merits of the dispute

between Scan Coin Industries and Coinstar.

15.     The Request for Arbitration filed by Scan Coin Industries is still pending before the

Arbitration Tribunal, and an oral hearing on certain issues is now scheduled for May 22-23, 2008.

At least one additional hearing thereafter is expected.

16.     Article 20.3 of the Agreement provides that "[t]his agreement shall be governed by the law of

Sweden."

17.     The pertinent provisions of Section 6 of the Swedish Interest Act provide that "interest shall

be calculated per annum according to a rate of interest equivalent to the reference rate of interest in

accordance with Section 9 as applicable from time to time, plus eight percentage points."  Section 9

of the Swedish Interest Act provides as follows:

> The reference rate of interest pursuant to this Act shall be determined each
> calendar half year through a special decision taken by the Central Bank of
> Sweden. The reference rate of interest shall correspond to the rate of interest
> applied by the Central Bank of Sweden in the principal refinancing
> transactions carried out immediately prior to the calendar half year during
> which the rate of interest is to apply, rounded up to the nearest half
> percentage point.

The interest rate applied by the Central Bank of Sweden in principal refinancing transactions

for the period of July – December 2007 was 3.5% and the interest rate for the period of January –

June 2008 is 4%.  Therefore, according to the provisions of Section 6 and Section 9 of the Swedish

Interest Act and in light of the interest rates published by the Central bank of Sweden, the interest

rates applied to Coinstar's unpaid balance are 11.5% for the period from July 6, 2007 to December

31, 2007 and 12% for the period from January 1, 2008 to the present date.

18.     On May 12, 2008, Anders Perborn sent an email to Jonas Benedictsson, Coinstar's counsel

for the Arbitration pending before the Arbitration Institute.  In the email,  Mr. Perborn requested that

Coinstar execute payment of the € 156,800 award on May 19, 2008, plus accumulated interest through May 19, 2008.  A true and accurate copy of that email is attached to the Declaration of Mr. Ovin as **Exhibit C**.

19.     The United Nations Convention on the Recognition and Enforcement of Arbitral Awards (the "Convention") applies to "the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such award is sought" Convention, art. I, June 10, 1958.  The Convention defines "arbitral awards" to "include not only awards made by arbitrators appointed for each case, but also those made by permanent arbitral bodies to which the parties have submitted."  *Id.*, art. II.  "Each Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon."  *Id.*, art. III.

20.     The Federal Arbitration Act states that "[t]he Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall be enforced in United States courts in accordance with this chapter."  9 U.S.C. §  201.  Arbitrations falling within the scope of the Convention are deemed to arise under the laws and treaties of the United States, and the district courts of the United States have original jurisdiction over such an action or proceeding, regardless of the amount in controversy."  *See* 9 U.S.C. § 203.  "Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration."  9 U.S.C. § 207.  Unless the district court finds grounds to refuse or defer the recognition or enforcement of the arbitral award, the court must confirm the award.  *See id.*  If the court finds that confirmation of the arbitral award is proper, "the judgment shall be docketed as if it were rendered in

an action" and the judgment "shall have the same force and effect, in all respects, as, and be subject to all the provisions of law relating to, a judgment in an action; and it may be enforced as if it had been rendered in an action in the court in which it is entered."  9 U.S.C. § 13.

21.    Both Sweden and the United States are parties to the Convention.  The Convention entered into force in Sweden on April 27, 1972.  The Convention also entered into force in the United States on December 29, 1970, and is codified at 9 U.S.C. §§ 201 – 208.

22.    Scan Coin Industries initiated the arbitration against Coinstar before the Arbitration Institute, in accordance with the arbitration clause of the Agreement.  The Arbitration Institute is a "permanent arbitral [body] to which the parties have submitted," as required by Article II of the Convention.  The ongoing arbitration between Scan Coin Industries and Coinstar is a proceeding falling under the Convention, and, therefore, this court has original jurisdiction over this matter.  *See* 9 U.S.C. § 203. Scan Coin Industries has properly applied to this court for an order confirming the award against Coinstar in compliance with 9 U.S.C. § 207 and the provisions of the Convention.

23.    In confirming the award, the judgment should be converted from EUROS to U.S. DOLLARS.  Scan Coin Industries shows that according to the Wall Street Journal, a financial newspaper that is regularly consulted and relied upon in the marketplace for currency exchange rates, the exchange rate for ONE EURO to U.S. DOLLARS was $1.5507 on May 19, 2008.  *See Curriencies*, Wall St. J., May 20, 2008, at C14.  At that exchange rate the principal € 156 800 award granted on May 8, 2008, converts to $ 243,149.76.  In addition, interest calculated in accordance with Swedish law through May 19, 2008, totals € 16,040, which, at that exchange rate, converts to $ 24,873.23.  In accordance with Section 6 of the Swedish Interest Act, interest continues to accrue

on the award until paid at the rate of € 51.55 or $ 79.94 per diem.  Alternatively, Scan Coin asks that

judgment be entered in U.S. Dollars in accordance with the procedure followed in *Sae Sadelmi S.p.A.*

*v. Papua New Guinea Electricity Commission*, 1994 U. Dist. 16978, *4-5 (S.D.N.Y. Nov. 29, 1994).


**WHEREFORE**, Scan Coin Industries prays that the Court grant its relief as follows:

(1)      that, pursuant to 9 U.S.C. § 13, the Court enter an order and judgment confirming the

Separate Award on Costs issued by the Arbitration Institute on May 8, 2008;

(2)      that the Court enter the award in the appropriate amount of U.S. Dollars Principal and

Interest and further order that interest continue to accrue at the appropriate per diem rate under

Section 6 of the Swedish Interest Act from the date of judgment; and

(3)      that the Court afford Scan Coin Industries such other further relief as the Court deems

equitable and just.


Dated: May 23, 2008                               s/ Fred E. Schulz
                                                  _____
                                                  Fred E. Schulz
                                                  Attorney for Scan Coin Industries AB,
                                                  a Swedish corporation


Fred E. Schulz
WILDMAN, HARROLD, ALLEN & DIXON LLP
225 West Wacker Drive, Suite 3000
Chicago, Illinois 60606
(312) 201-2658 (Direct)
(312) 201-2555 (Fax)
ARDC No.:  2516500
schulz@wildman.com


WCSR  3900634v9

08CV3028
JUDGE NORGLE
MAGISTRATE JUDGE NOLAN

# EXHIBIT A

Exhibit 1

A G R E E M E N T

made and entered into as of April 30, 1993 by and between

The Skydeck Corporation, 495 Old Spanish Trail, Suite B, Portola Valley, California 94028, USA (hereafter called "Skydeck")

and

Scan Coin AB, Reg No 556193-2673, Jägershillgatan 26, 213 75 Malmö, Sweden (hereafter called "Scan Coin").

1.      Background

WHEREAS Skydeck is in the process of developing a coin deposit machine with dispensing discount coupons to customers in or in connection with retail establishments, which machine Skydeck intends to own and operate in such places, and

WHEREAS Scan Coin has developed a coin validation and counting unit which can be applied as part of Skydeck's aforementioned machine, and which unit Skydeck wishes to buy from Scan Coin.

NOW THEREFORE, in consideration of the premises and mutual covenants contained herein, the parties agree as follows.

2.      Definitions

For the purpose of this Agreement

2.1    "Product" shall mean a coin validation and counting unit currently in the form set out in Attachment 1, and parts thereof, as well as all improvements and developements thereof.

2.2    "Machine" shall mean the coin deposit machine (self service) with dispensing discount coupons to customers in or in connection with retail establishments. The Machine is developed by Skydeck.

2.3    "Territory" shall mean the United States of America, Canada and Mexico.

3.    Grant, exclusivity etc.

3.1    Skydeck hereby engages Scan Coin on an exclusive basis and Scan Coin agrees to manufacture and supply the Product to Skydeck for use in the Machine in the Territory.

3.2    Skydeck undertakes during the term of this Agreement not to manufacture or from any other party than Scan Coin buy or use products similar to the Product for use in the Machine. Skydeck is only allowed to use the Product in the Machine and undertakes neither directly nor indirectly through another party to utilize the Product for other purposes.

3.3    Scan Coin undertakes, not to sell the Products to customers of whom Scan Coin knows that they intend to use the Product within the Territory in coin deposit machines (self service) with dispensing discount coupons to customers in or in connection with retail establishments, developed, owned or handled by other than Skydeck. This obligation does not restrict Scan Coin to sell the Product as a part

of Scan Coin's validation, counting and sorting machines included in Scan Coin's normal product range. However, Scan Coin undertakes in the Territory not to sell without Skydeck's approval, any Scan Coin sorting self service product together with the improvements and developments according to Clause 6.1, excluding the extra solenoid, which compete with the Machine. Such approval shall not be unreasonably witheld.

3.4    Skydeck has estimated to order and take deliveries of the following minimum quantities of units of the Product during the term of the Agreement.

| Year | Units of the Product |
|------|----------------------|
| 1993 | 25 |
| 1994 | 350 |
| 1995 | 1.000 |
| 1996 | 1.250 |
| 1997 | 1.750 |
| 1998 | 2.500 |
| Total | 6.875 |

Should actual orders and deliveries of units of the Product for one year exceed estimated minimum quantities such excess units of the Product shall be credited Skydeck against the following year's minimum quantity. Any delayed delivery from Scan Coin shall adjust the timing of the said minimum quantities accordingly.

Should Skydeck not order and take deliveries according to above mentioned estimated minimum quantities of units of the Product, Skydeck's exclusivity granted in Clauses 3.1 and 3.3 is terminated without

notice and Scan Coin is free to sell the Product to any other third party irrespectively of the customers' use of the Product.

Skydeck is entitled to retain its exclusivity according to Clauses 3.1 and 3.3 by compensating Scan Coin for the loss of its net contribution, as defined in Attachment 3, calculated on the difference in said estimated quantities and actual delivered quantity of the Product for the calendar year. Such compensation to Scan Coin shall be paid by Skydeck on March 1 at the latest, following the year under which the minimum quantity has not been met.

4.        Price etc

4.1     Scan Coin's price for deliveries of the Product during the full calendar year of 1993 is set out in Attachment 2.

4.2     For each subsequent calendar year after 1993 the parties shall meet in October, before the new calendar year, to agree on a new price effective from the following January 1st. The new price shall be based on Scan Coin's price model set out in Attachment 3, which price model Scan Coin has utilized in its calculation of the price set out in Attachment 2.

4.3     Notwithstanding the above, Scan Coin's price shall be subject to increase or decrease at any time during the course of a calendar year with immediate effect on orders not yet confirmed by Scan Coin, in the event it is established the costs related to any of the items included in the price model pursuant to Attachment 3, have changed, more than five (5) per cent compared with the level of such costs in the

price model at the time the prevailing price was established. Said minimum 5 per cent change of costs shall also be reflected and included in the new price.

From the first delivered 6.875 units of the Product SEK 350 shall be deducted from the calculated price for each unit as compensation for Skydeck's payment of improvement- and development work (cf Clause 6.2)

5.      Delivery and payment

5.1     Unless otherwise agreed, deliveries of the Product shall be Ex works, Incoterms 1990, Scan Coin's premises in Malmö, pursuant to the delivery terms set out in Attachment 4.

5.2     Payment shall, if not otherwise agreed, be against Letter of Credit payable at sight.

6.      Specification, improvement- and development work etc.

6.1     The technical specification of the Product and the improvement- and development work and the functional responsibility for soft- and hardware related to the Product are set out in Attachment 5.

6.2     The costs for the improvement- and development work, which shall be paid by Skydeck as expenses, are set forth in Attachment 6. The costs for the work according to Phase II and III (Design, prototype and testing phases) shall be paid by Skydeck with 50% (SEK 265.250) at the signing of this Agreement and the remaining 50% (SEK 265.250) by Skydeck simultaneously on delivery of the prototypes. The costs for the work according to Phase IV (Manufacturing phase)

shall be paid by Skydeck with 50% (SEK 130.000) im-
mediately after the termination of Phase III and the
remaining part by Skydeck simultaneously on delivery
of the 25 units of the Product (0-serie).

The improvement- and development costs for the se-
rial production shall be paid by Skydeck and is esti-
mated to a maximum of SEK 1.650.000. As soon as a
more accurate estimation of the costs has been
carried out the parties shall agree on Skydeck's
terms of payment of the costs.

Skydeck's expenses for the improvements- and deve-
lopment costs will be reimbursed Skydeck by deduc-
tion from the calculated price for units of the
Product according to Clause 4.3 last paragraph.

7.        Time schedule, 0-serie etc

7.1       During the calendar year 1993 the Product will be
          developed and tested and 25 units of the Product
          (0-serie) will be ordered and delivered to Skydeck.
          The parties have estimated the work and time sche-
          dule according to Attachment 7. The parties shall
          with due diligence make their best efforts to keep
          this time schedule.

8.        Forecast, placement of purchase orders etc

8.1       Forecast, placement of purchase orders and delivery
          times for the serial production of the Products af-
          ter deliveries of the first one thousand (1000)
          units of the Product are set forth in Attachment 8.

          Initial start up phase for the serial production
          (included first order of such production) shall be
          subject for a separate agreement between the parties.

After the initial phase and up to the delivery of the first one thousand (1000) units of the Product (included the first order for serial production in the initial start up phase), the six months forecast in Attachment 8 is replaced by a running quarterly forecast submitted by Skydeck to Scan Coin 10-12 weeks before each quarter of the year, showing a forecast for that quarter. This forecast will be considered as a firm order ± 30%. Except as stated in this paragraph Attachment 8 applies on said deliveries of the first one thousand units of the Product.

8.2    Scan Coin shall use its best efforts to provide Skydeck with any additional quantities of the Product in excess of Skydeck's estimated minimum quantities of units of the Product according to Clause 3.4.

8.3    Should Scan Coin encounter substantial difficulties in fulfilling confirmed orders to Skydeck, Scan Coin is willing to discuss the setting up of a joint production of the Product in the United States of America.

9.    Intellectual Property

9.1    Skydeck acknowledges that Scan Coin is the owner of all intellectual property related to the Product, including but not limited to all rights to patents, patent applications, know-how, designs, trade secrets etc.

9.2    Any patent or patent application resulting from the work with a new product (for example components that are compatible with the Product, which does not fall under the definition in Clause 2.1) developed and

built by Scan Coin on request of Skydeck belongs to Skydeck under condition that the work has been finally paid for by Skydeck. Scan Coin has the first option to negotiate a license under such patent or patent application. Skydeck is not entitled to grant a license to any third party on more favourable conditions than those offered to Scan Coin, under the condition that Scan Coin within thirty (30) days after the offering of the license declares its interest to acquire the license. Skydeck has the corresponding right to, under the same conditions, negotiate a license for the Territory under any new patent- or patent application that belongs to Scan Coin and relates to the Machine.

Intellectual property related to a new product that is not owned by Skydeck according to the forthgoing paragraph belongs to Scan Coin.

### 10.    Tools etc

10.1    Production equipment such as tools, special testing equipment etc required exclusively for the improvement and development of the Product according to Clause 6.2 shall be paid by the parties in equal shares and shall remain the property of Scan Coin. The costs for the production equipment is estimated to approximately SEK 830,000. All replacement tooling will be paid for by Scan Coin.

### 11    Documentation

11.1    Scan Coin's technical documentation regarding the Product which is necessary for the operation and support of the Product and the market, shall be furnished by Scan Coin to Skydeck. The documentation

includes a technical function description, maintenance description, physical interfacing description, software interface description, circuit diagram, mechanical/electrical assembly drawings and spare parts lists.

Skydeck shall be free to furnish above mentioned documentation to its customers and service organization (cf Clause 16.1).

12    Warranty

12.1    Scan Coin represents and warrants that the Product is manufactured in accordance with the specification and requirements set forth in Attachment 1 or agreed upon between the parties separately in writing. Scan Coin's liability in respect of any defective parts of the Product shall be limited to the sending of an equivalent part without delay to Skydeck. Skydeck is not entitled to a price reduction for any defective part and Scan Coin is not responsible for any damages incurred directly or indirectly in connection with the sale or use of the Product. Skydeck shall return all defective parts to Scan Coin for approval whether the defect is included under Scan Coin's warranty. The freight cost for the return of the defective part to Scan Coin and the sending of an equivalent part shall be carried by Scan Coin. Scan Coin shall make available any spare parts of all versions of the Product for ten (10) years from delivery of each unit of the Product at a price established pursuant to the price model in Attachment 3. Scan Coin will maintain a level of spare parts to be agreed upon between the parties annually.



Any claim under the warranty against defects in material and workmanship shall be allowed only when it is submitted to Scan Coin in writing within thirty (30) days after the discovery of the defect and in any event within twelve (12) months after the delivery of the Product to Skydeck.

13.    Product Liability

13.1    Scan Coin shall be liable for personal injury only if it is proved that such injury was caused by negligence on the part of Scan Coin or others for whom Scan Coin is responsible.

Scan Coin shall not be liable for damage to property occurring whilst the Product is in the possession of Skydeck. Nor shall Scan Coin be liable for damage to products manufactured by Skydeck, or to other products of which Skydeck's products form a part. Apart from these limitations Scan Coin shall be liable for damage to property on the same conditions as for personal injury.

Scan Coin shall in no circumstances be liable for loss of production, loss of profit or any other consequential damage and indirect loss.

To the extent Scan Coin might incur product liability towards any third party as a result of a Product purchased by Skydeck, Skydeck shall indemnify Scan Coin as far as Scan Coin's liability has been limited by the three preceding subparagraphs.

If a claim for damage as described in this Clause is lodged by a third party against one of the parties, the latter party shall forthwith inform the other party thereof.

The above limitations in Scan Coin's liability shall not apply where Scan Coin is shown to have been guilty of gross misconduct.

14.     Force Majeure

14.1     The following circumstances shall be considered as cases of force majeure if they intervene after the formation of this Agreement and impedes its performance: Government laws or regulations, industrial disputes, war, riot, fire or any other causes beyond the control of such party.

The party wishing to claim force majeure shall notify the other party in writing without delay of the occurrence and cessation thereof.

15.     Project Group, etc

15.1     For the continuous supervision of the parties' performance under this Agreement, and with reference to the future improvement and development of the Product, Scan Coin and Skydeck shall form a joint permanent project group, (hereafter called the "Project Group"), consisting of one representative from each party. The Project Group shall meet on a regular basis. Each party shall carry the cost for its own representation in the Project Group. Minutes from the meetings in the Project Group shall be kept and approved by both parties' representatives.

Within the framework of the Project Group the parties shall discuss Skydeck's possible need for further improvement and development of the Product beyond what is agreed in Clause 6.1. If prepared to implement Skydeck's improvement and development

proposals, Scan Coin shall indicate its impact on already agreed requirements, price pursuant to the price model in Attachment 3, delivery terms, warranties and other material conditions. Any improvement or development of the Product, beyond what is agreed in Clause 6.1, discussed in the Project Group shall only be implemented to the extent that the parties have agreed in writing on the terms of such development.

16.    Secrecy

16.1    All information exchanges under this Agreement shall be regarded as confidential and is for the use of the receiving party solely for the purpose of this Agreement. The parties may not use or disclose any such information to a third party without the prior written consent of the furnishing party and shall take all reasonable measures to prevent unauthorized use or disclosure of confidential information by their own employees and/or consultants. This secrecy undertaking shall be effective during the term of this Agreement and for a period of five (5) years following its termination.

Any confidential documentation furnished by one party to the other shall be treated by the other party in relation to customers and service organization in the same way as the other party would treat its own confidential information.

17.    Assignment

17.1    Neither party shall have the right to assign his rights or obligations pursuant to this Agreement without the prior written consent of the other

party, which consent shall not be unreasonably with-held. Such consent shall not be required in connec-tion with an assignment to a successor entity re-sulting from a corporate reorganization of either party (including without limitation a reincorpora-tion) under the condition that the transferor in writing guarantees the succeeding entity's obliga-tions according to this Agreement.

18.    Duration of the Agreement

18.1    This Agreement becomes effective on the date first set forth on page 1 above and remains effective until either party terminates this Agreement with six (6) months written notice, provided that such termination shall never become effective before December 31, 1998.

19.    Premature termination

19.1    If either party should commit a material breach of the provisions of this Agreement, the other shall - in case of a breach capable of remedy - give written notice requiring such breach to be remedied, and in the event of such breach not being remedied within one (1) month of the date of service of such notice, or in the case of a breach not capable of remedy, have the right to terminate this Agreement forth-with, unless the breach relates to any of the cir-cumstances referred to in Clause 14 (Force Majeure) above. If the grounds of force majeure according to Clause 14 subsist for more than three (3) months the other party shall be entitled to terminate this Agreement forthwith.

This Agreement may otherwise be terminated imme-

diately upon written notice by

(1)    any party in the event the notified party becomes insolvent,

(2)    Scan Coin if Skydeck, during any year, orders and takes deliveries of less than 30 per cent of the estimated minimum quantities of units of the Product stipulated under Clause 3.4,

(3)    Scan Coin if Skydeck discontinues its business relating to the Product.

(4)    Skydeck if Scan Coin at two (2) consecutive occasions has failed to fulfil confirmed orders to Skydeck within thirty (30) days calculated from committed delivery date,

(5)    Skydeck if Scan Coin's price for the Product, calculated according to the price model in Attachment 3, any calendar year has increased in SEK with more than 15% or in USD with more than 25%.

Skydeck is only entitled to terminate the Agreement according to point 5 above after the parties in good faith have concluded negotiations regarding measures to reduce the costs for the Product, a joint production of the Product or part thereof in the United States of America etc.

20.    <u>Arbitration and Governing Law</u>

20.1    This Agreement presupposes a close and confidential

collaboration and the parties intend to try to solve as they arise, such problems as are not envisaged in this Agreement, or may otherwise give rise to a difference of opinion between the parties.

20.2    Any dispute, controversy or claim arising out of or in connection with this Agreement, or the breach, termination or invalidity thereof, shall be settled by arbitration in accordance with the Rules of the Arbitration Institute of the Stockholm Chamber of Commerce.

The arbitral tribunal shall be composed of three (3) arbitrators.

The place of arbitration shall be Malmö, Sweden.

The language to be used in the arbitral proceedings shall be English.

20.3    This Agreement shall be governed by the law of Sweden.

21.    Notices

21.1    All notices, reports, payments and communications required by this Agreement by one party to the other shall be addressed to the parties at their respective official addresses as set forth above or to such other addresses notified by either party in writing. All such notices, reports, payments and communications shall be made by personal delivery, or telex, or telecopier, or registered mail, and shall be considered as served the date received, provided however, in the case of registered mail, that it shall be deemed to have been served at the

expiration of ten (10) days from the time of being posted and proof that the letter was properly addressed and posted shall be sufficient proof of service.

22. Severability

22.1 If any provision of this Agreement should be or become fully or partly invalid or unenforceable for any reason whatsoever or should violate any applicable law, this Agreement is to be considered divisible as to such provision and such provision is to be deemed deleted from this Agreement, and the remainder of this Agreement shall be valid and binding as if such provision was not included herein. There shall be substituted for any such provision, a suitable provision which, as far as legally possible, comes nearest to what the parties desired or would have desired according to the sense and purpose of this Agreement, had they considered the point when concluding the Agreement.

---

The parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

SCAN COIN AB

Jack Karlsson

THE SKYDECK CORPORATION

2234L/EE

Attachment 1
93-04-28

## Definition of the "Product"

The *"Product"* in paragraph 2.1 is defined as:

For *prototypes and 0-series:*

- CAM 640
- Outlet mechanism for sixteen US bags

For *serial production:*

- CAM 202
- Outlet mechanism for sixteeen US bags

Attachment 2
93-04-28

# Product Cost and Product Price

Indicative Product Cost (PC) and Product Price (PP) in SEK, ex works Malmö

| Parts description | 0-series (25 units) | | 1000 units/year | |
|---|---|---|---|---|
| | Product Cost (SEK) | Product Price (SEK) | Product Cost (SEK) | Product Price (SEK) |
| CAM 640 | 9990 | 16985 | | |
| CAM 202 | | | 8010 | 12816 |
| Outlet mechan. for 16 US bags | 3900 | 6630 | 2350 | 3760 |

The Product Prices in the column for 1000 units/year is based on the price model in Attachment 3.

The parts are defined in Attachment 5.

For each part the packing is included in the Product Price.

Attachment 3
1993-03-05

1.  PRODUCT COST CALCULATION

Product cost is defined as follows:

Direct material                                    $X$
Direct processing costs                       $+\ \underline{Y}$

Product cost (PC)                               $=X\ +\ Y$

Direct material includes material, plus additional costs such as freight, insurance, duties etc.

Direct processing costs include direct assembly costs and other costs related to the production only.

2.  PRODUCT PRICE (1.000 units/year)

Product price (PP) = 1.6 x PC

3.  SPARE PART PRICES

Prices according to Scan Coin's standard export price list for subsidiaries.

4.  "Net contribution" according to § 3.4 is to be defined as 15 % of Product Price (PP).

CONDITIONS OF DELIVERY

1.  **General**
    These terms shall apply on every delivery of products from Scan Coin to the purchaser, unless otherwise specifically agreed upon in writing between Scan Coin and the purchaser.

2.  **Order and Confirmation of Order**
    Scan Coin will confirm an order from the purchaser by written confirmation. Objections against Scan Coin's confirmation of order must be made without delay.

3.  **Trading Terms**
    All trading terms used in orders and/or confirmations of order will be construed in accordance with Incoterms 1990 as amended. If no trade term is specifically agreed upon the delivery shall be Ex Works.

4.  **Product Information**
    Information given by Scan Coin in broschures and otherwise is binding on Scan Coin only when specific reference to such information is made in the confirmation of an order.

5.  **Drawings and Technical Documentation**
    Any drawings and technical documents submitted by Scan Coin to the purchaser prior or subsequent to the formation of the contract remain the exclusive property of Scan Coin. They may not, without Scan Coin's prior written approval, be utilized by the purchaser or copied, reproduced, transmitted or otherwise communicated to a third party.

6. **Packing**

The sales price includes packing, sufficient to protect the products under normal conditions.

7. **Part Delivery**

Any portion of a confirmed order of the products may be shipped as soon as completed at the plant, and payment for any portion so shipped, shall become due in accordance with the Terms of Payment, provided that the purchaser agrees to receive the part delivery. Scan Coin will pay for any additional shipping and handling charges incurred due to the part delivery.

8. **Penalty**

If not other agreement has been made, penalty for late delivery (part delivery) shall be paid by Scan Coin at a rate of two (2) % per thirty (30) days delay.

The penalty shall be calculated on the basis of the price of the products delayed.

The total sum of penalties for late deliveries shall not exceed five (5)% of the price of the products delayed.

Should the purchaser according to point 7 chose not to take part delivery no penalty shall be paid by Scan Coin related to the offered part delivery.

In addition to the above, the purchaser is not entitled to any compensation for damage in case of late delivery.

2306L/EE

Attachment 5
93-04-28

### Technical Specification of the "Product" and definition of the responsibility for the function of software/hardware

## A. Technical specification

### CAM 640

The CAM unit to be used in the "Machine" is a standard CAM 640 with the following modifications:

- Extra solenoid to sort dimes from pennies
- Holes in the bottom of the hopper to allow dirt to fall through into a dirt collector.
- Entire hopper on hinges to permit more accessible cleaning of the rail and the hopper.
- The transition zone between the rotating rubber disc and the rail will be modified to avoid dirt getting stuck in this area.
- MIB interface board
- Excl. printer
- Excl. coin chutes

### CAM 202

Same as CAM 640 but with the MIB interface board replaced by two PC extension boards.

### Outlet mechanism

The outlet mechanism shall feed coins from the CAM unit (either CAM 640 or CAM 202) into sixteen US sized bags according to the following arrangement:

| P | P | P | P | P | N | Q | D |
|---|---|---|---|---|---|---|---|
| P | P | P | P | P | N | Q | D |

P = 1c  (Penny)
N = 5c (Nickel)
D = 10c (Dime)
Q = 25c (Quarter)

Attachment 5
93-04-28

**B. Functional responsibility for hardware/software**

*Scan Coin* have functional responsibility for the following functions:

To be agreed upon separately

*Skydeck* have functional responsibilitiy for the following functions:

To be agreed upon separately

2

Attachment 6
93-04-28

## <u>Specification of R&D costs</u>

Referring to the definition of project phases in Attachment 7, the following specification of R&D costs is made:

- **Prototype and 0-series**
  - *Phase I:* Prestudy phase:                                          No cost
  - *Phase II & III:* Design, prototype and testing phases 530 500 SEK
  - *Phase IV:* Manufacturing phase                        260 000 SEK
  - TOTAL for Phase I - IV                                   790 500 SEK

- **Serial production, total**                          1 650 000 SEK

- **TOTAL project cost**                               2 440 500 SEK





Skydeck Coin Exchange unit
Project time schedule for Scan Coin deliveries

Attachment 7

Issue no 3   C Breitholtz/93-04-28



**Skydeck Coin Exchange unit**
Project time schedule for Scan Coin deliveries

# Forecast, placement of purchase orders

199X

| Jan (1) | Feb (2) | Mar (3) | Apr (4) | May (5) | Jun (6) | Jul (7) | Aug (8) | Sep (9) | Oct (10) | Nov (11) | Dec (12) |

DP 4= Delivery period no 4

F5= Forecast for delivery period 5; firm order +/- 20%

F6= Forecast for delivery period 6; firm order +/- 30%

The total quantity ordered for a certain Delivery Period (DP) can be delivered in the beginning of each DP, even if at least two shipments is preferred.

DP 5= Delivery period no 5

F6= Forecast for delivery period 6; firm order +/- 20%

F7= Forecast for delivery period 7; firm order +/- 30%

DP-4 | F5 | F6

DP 5 | F6 | F7

5w

5w

Firm order for Delivery Period 4, DP 4
Forecast for Delivery Period 5, F5
Forecast for Delivery Period 6, F6

Firm order for Delivery Period 5, DP 5
Forecast for Delivery Period 6, F6
Forecast for Delivery Period 7, F7

Indicative forecast for July-December, w/o commitment

Forecast for January-June
Firm order +/-20%

Indicative forecast for January-June w/o commitment

Forecast for July-December
Firm order +/-20%

12w

12w

Skydeck submit forecast for six plus six months

Skydeck submit forecast for six plus six months

Exhibit 2

## AMENDMENT TO AGREEMENT

entered April 30, 1993, by and between Scan Coin AB and the Skydeck Corporation ("the Agreement").

---

The Skydeck Corporation has after the entering of the Agreement changed its business name and is now carrying out its business under the name Coinstar, Inc. at the address 13231 S.E. 36th Street, Suite 200, Bellevue, WA 98006.

Scan Coin AB ("Scan Coin") and the Coinstar, Inc. ("Coinstar") have now agreed that the minimum delivery quantities and the duration of the Agreement shall be modified and that the Clauses 3.4 and 18.1 in the Agreement therefore shall have the following wording.

3.4      Coinstar has estimated to order and take deliveries of the following minimum quantities of units of the Product during the term of the Agreement.

| Year | Units of the Product | |
|------|---------------------|---|
| 1993 | 25 | (already completed) |
| 1994 | 90 | (already ordered) |
| 1995 | 750 | |
| 1996 | 1.125 | |
| 1997 | 1.500 | |
| 1998 | 2.125 | |
| 1999-01-01--1999-06-30 | 1.300 | |
| TOTAL | 6.915 | |

Should actual orders and deliveries of units of the Product for one year exceed estimated minimum quantities such excess units of the Product shall be credited Coinstar against the following year's minimum quantity. Any delayed delivery from Scan Coin shall adjust the timing of the said minimum quantities accordingly.

Should Coinstar not order and take deliveries according to above mentioned esti-mated minimum quantities of units of the Product, Coinstar's exclusivity granted in Clauses 3.1 and 3.3 is terminated without notice and Scan Coin is free to sell the Product to any other third party irrespectively of the customer's use of the Product.

Coinstar is entitled to retain its exclusivity according to Clauses 3.1 and 3.3 by com-pensating Scan Coin for the loss of its net contribution, as defined in Attachment 3, calculated on the difference in said estimated quantities and actual delivered quantity of the Product for the calendar year (and for 1999 its first 6 months). Such compen-sation to Scan Coin shall be paid by Coinstar on March 1 at the latest, following the year under which the minimum quantity has not been met.

...

18.        Duration of the Agreement

18.1      This Agreement becomes effective on the date first set forth on page 1 above and re-mains effective until either party terminates this Agreement with six (6) months written notice, provided that such termination shall never become effective before June 30, 1999.

—————————————

Clause 20.2 in the Agreement regarding Arbitration is applicable on this amendment to the Agreement. Except for the Clauses 3.4 and 18.1 allt other contractual obligations in the Agreement are unchanged.

—————————————

In witness whereof, the parties have executed this amendment to the Agreement in duplicate, each party taking one copy, the last day and year written below.

Date: Aug 10, 1994
SCAN COIN AB

_____

Date: Sept 1. 1994
COINSTAR INC.

_____

Exhibit 3

## AMENDMENT TO AGREEMENT

entered April 30, 1993, with amendment to agreement entered September 1, 1994, by and between Scan Coin AB and Coinstar Inc.("the Agreement").

————————————

Scan Coin AB ("Scan Coin") and the Coinstar, Inc. ("Coinstar") have now agreed that the Clauses 2.2, 2.3 and 3.3 in the Agreement shall have the following wording.

2.2     "Machine" shall mean the coin deposit machine (self service) with or without dispensing discount coupons to customers in or in connection with retail establishments. The Machine is developed by Coinstar.

2.3     "Territory" shall mean

    (i)   United States of America, Canada and Mexico in relation with the Machine with dispensing discount coupons,

    (ii)   United States of America in relation with the Machine without dispensing discount coupons.

3.3     Scan Coin undertakes, not to sell the Products to customers of whom Scan Coin knows that they intend to use the Products

    -  within the USA in coin deposit machines (self services), owned or handled by other than Coinstar and where the customer´s main target group is retail establishments,

    -  within Canada and Mexico in coin deposit machines (self services) with dispensing discount coupons to customers in or in connection with retail establishment, developed owned or handled by other than Coinstar.

This obligation does not restrict Scan Coin to sell the Products as a part of Scan Coin's normal product range. However, Scan Coin undertakes in the Territory not to sell without Coinstar's approval, any Scan Coin self service product together with the improvements and developments according to Clause 6.1, excluding the extra solenoid, which competes with the Machine. Such approval shall not be unreasonably withheld.

———————————

Clause 20.2 in the Agreement regarding Arbitration is applicable on this amendment to the Agreement. Except for the Clauses 2.2, 2.3 and 3.3 all other contractual obligations in the Agreement are unchanged.

———————————

In witness whereof, the parties have executed this amendment to the Agreement in duplicate, each party taking one copy, the last day and year written below.

Date: *1995-02-15*
SCAN COIN AB

_____

Date: *2-15-15*
COINSTAR INC.

_____

lon\avtal\coinamen/cen

08CV3028   EDA
JUDGE NORGLE
MAGISTRATE JUDGE NOLAN

# EXHIBIT B



# ARBITRATION INSTITUTE
## OF THE STOCKHOLM CHAMBER OF COMMERCE

Box 16050, Stockholm, Sweden.
Phone + 46-8-555 100 50, fax + 46-8-566 316 50
www.sccinstitute.com

**SEPARATE AWARD ON COSTS**
Made in Malmö on 8 May 2008
Seat of arbitration is Malmö
**Arbitration No.: V 032/2007**

| | |
|---|---|
| **Claimant:** | Scan Coin Industries AB, company registration number 556193-2673<br>Jägerhillgatan 26<br>213 75 Malmö<br>VAT number SE 556193267301 |
| **Claimant's Counsel:** | Advokat Lennart Olsson<br>Advokat Anders Perborn<br>Wistrand Advokatbyrå<br>Box 4149<br>203 12 Malmö<br>Sweden<br>Mr. Kirk W. Watkins<br>Womble Carlyle Sandrige & Rice, PLCC<br>One Atlantic Center, Suite 3500<br>1201 West Peachtree Street<br>Atlanta, GA 30309<br>USA |

| | |
|---|---|
| **Respondent:** | Coinstar Inc.<br>1800 114th Avenue SE<br>Bellevue, WA 98004<br>USA, |
| **Respondent's Counsel** | Advokat Jonas Benedictsson<br>Jur kand Magnus Stålmarker<br>Baker & McKenzie Advokatbyrå<br>Advokat Ragnar Lundgren<br>Advokat Ragnar Lundgren AB<br>c/o Gozzo Advokater<br>Nybrogatan 11<br>114 39 Stockholm<br>Sweden. |
| **Arbitral Tribunal:** | Justitierådet Gustaf Möller<br>Advokat Tore Wiwen-Nilsson<br>Advokat Ulf Dahlgren |

TABLE OF CONTENTS

I. The Parties ........................................................................................................ 3

II. Background, Arbitration Clause, Applicable Law and Procedure ..................... 3

III  Scan Coin's Request .......................................................................................... 6

IV Coinstar's position .............................................................................................. 7

VI Reasons .............................................................................................................. 12

VII DECISION ....................................................................................................... 16

## I. The Parties

1.  Scan Coin Industries AB ("**Scan Coin**") is a private limited company organised and existing under the laws of Sweden and is engaged in the development, manufacturing and sales of coin and note handling equipment. Scan Coin was previously named Scan Coin Aktiebolag.

2.  Coinstar Inc ("**Coinstar**") is a publicly traded corporation listed on the NASDAQ stock exchange and existing under the laws of the state of Delaware in the United States of America. Coinstar was previously named Skydeck Corporation. Coinstar is engaged in the business of providing services at the front of retail stores consisting of i.a. coin counting machines and entertainment service machines.

## II. Background, Arbitration Clause, Applicable Law  and Procedure

3. Scan Coin and Coinstar entered into an agreement on 30th April 1993, regarding the manufacture and sale of Scan Coin's coin validation and counting unit for the use in a coin deposit machine developed by Coinstar. The agreement was amended on 1st September 1994 and on 15th February 1995. The agreement, as amended, is hereinafter referred to as the **Agreement.**

4. The Agreement provides in 20.2 as follows:

   > "Any dispute, controversy or claim arising out of or in connection with this Agreement, or the breach, termination or invalidity thereof, shall be settled by arbitration in accordance with the Rules of the Arbitration Institute of the Stockholm Chamber of Commerce.
   > The Arbitral Tribunal shall be composed of three (3) arbitrators.
   > The place of arbitration shall be Malmö, Sweden.
   > The language to be used in the arbitral proceedings shall be English.

5. The Agreement provides in 20.3. as follows:

   > "This Agreement shall be governed by the law of Sweden."

6. Scan Coin has on 10th April 2007 initiated arbitration against Coinstar by filing a Request for Arbitration, dated 4th April 2007, hereinafter referred to as the **Request,** to the Arbitration Institute of the Stockholm Chamber of Commerce, hereinafter referred to as the **Institute,**

7. In its Request Scan Coin contends that Coinstar during the term of the Agreement has breached the Agreement in various ways mentioned in the Request and requests that the Arbitral Tribunal in an Award, *inter alia* orders Coinstar to pay to Scan Coin SEK 30 744 000 and interest according to section 6 of the Swedish Interest Act and declares that Scan Coin is the sole owner in relation to Coinstar to a number of individual patents specified in the Request.

8. In its Request Scan Coin appoints as arbitrator Advokat Tore Wiwen-Nilsson (Malmö, Sweden)

9. Coinstar submitted on 11th May 2007 to the Institute an Answer dated 10th May 2007. In the Answer Coinstar reserves the right to object to the applicability of the arbitration agreement to the whole or part of the dispute, as the case may be, until Coinstar has reviewed the full statement of claim and thus learned all the legal facts and circumstances relied on by Scan Coin. Moreover, Coinstar *inter alia* disputes all

the claims by Scan Coin and says that it will ask that they are rejected and/or dismissed in their entirety.

10. In its Answer Coinstar appoints as arbitrator Advokat. Ulf Dahlgren (Stockholm, Sweden).

11. Scan Coin has on 21st May 2007 to the Institute submitted a statement, dated the same day, as a response to select issues brought up by Coinstar in its Answer.

12. Coinstar has on 23rd May to the Institute submitted written comments to Scan Coin's statement dated 21st May 2007.

13. Scan Coin has on 23rd May to the Institute submitted written observations concerning Coinstar's written comments dated 21st May.2007.

14. The Institute has by letter dated 1st June 2007 informed the parties that it has appointed as Chairman of the Arbitral Tribunal Justitierådet Gustaf Möller (Helsinki, Finland) and determined the Advance on Costs at EUR 413 600 to be paid by the parties with half each. The Institute has in the same letter ordered Scan Coin to pay EUR 204 925 and Coinstar to pay EUR 206 800. The Registration Fee had credited to Scan Coin's part of the Advance on Costs. Payment was ordered to be made by 15 June 2007.

15. The Institute has by letter dated 19th June 2007 informed the Parties that Scan Coin has paid its part of the Advance on Costs and reminded Coinstar to pay by 26th June 2007 , EUR 206 800.

16. Coinstar has by letter dated 26th June 2007 and received by the Institute the next day informed the Institute that Coinstar, for the reasons mentioned in its Answer to the Request, declines to pay a full share of the Advance on Costs as decided by the Institute. Instead, Coinstar had decided to contribute an amount of EUR 50 000 towards the Advance on Costs, an amount Coinstar believes is reasonable under the circumstances

17. The Institute has, referring to Coinstar's letter dated 26th June 2007, by letter dated 27th June 2007 offered Scan Coin the opportunity to pay the remaining EUR 156 800.

18. By letter dated 11th July 2007, the Institute informed the Arbitral Tribunal that the parties had paid the Advance on Costs amounting to EUR 413 600, of which Scan Coin had provided an amount of EUR 363 600 and Coinstar an amount of EUR 50 000 and referred the case to the Arbitral Tribunal.

19. Scan Coin has on 30th August 2007 submitted its Statement of Claim and a Request for a Separate Award regarding the Advance on Costs, hereinafter referred to as **Request for a Separate Award.**

20. Coinstar has on 6th November 2007 submitted its Statement of Defence in which it has also replied to Scan Coin's Request for a Separate Award.

21. Scan Coin has on 21st December 2007 submitted its Replication, in which it has given further grounds for its Request for a Separate Award.

22. The Arbitral Tribunal has by letter dated 12th February 2008 informed Coinstar that, in case Coinstar wants to make any further submission as to Scan Coin's Request for a Separate Award, Coinstar shall do so on or before 18th February 2008.´

23. Coinstar has on 21st February 2008 submitted further written comments as to Scan Coin's request for a Separate Award.

24. A procedural conference was held before the Arbitral tribunal in Stockholm on 26th February 2008 at which both Parties were represented. At that conference the parties also presented arguments relating to Scan Coin's Request for a Separate award. In a letter dated 3rd April 2008, the Arbitral Tribunal informed the Parties that the Tribunal will shortly render a Separate Award concerning the reimbursement of the Advance on Costs.

## III  Scan Coin's Request

25. In its Request for a Separate Award Scan Coin requests that the Tribunal orders Coinstar:

      i)      to pay to Scan Coin EUR 156 800 and interest on the amount according to section 6 of the Swedish Interest Act from 6th July 2007 until payment has been made in full, and

ii)    to reimburse Scan Coin of its costs in relation to this Request for a Separate Award.

26. After Scan Coin had paid its part of the Advance on Cost the Institute informed Scan Coin that Coinstar would not make the required payment of EUR 206 800 but instead contribute with only 50 000. Therefore the Institute offered Scan Coin the opportunity to pay the remaining EUR 156 800 by 6th July 2007. Scan Coin made the payment of EUR 156 800 before or on said date.

27. According to Article 45 (4) of the Rules of the Institute (**SCC Rules),** which entered into force on 1st January 2007, the Arbitral Tribunal has a right through a separate award to order the payment of an Advance on Costs by one party on the other party's behalf, during on-going arbitral proceedings. This rule applies to any arbitration commenced on or after 1st January 2007. The arbitration procedure was initiated 4th April 2007. Consequently the Tribunal may issue a separate award regarding the costs.

28. As to the scope of the arbitration agreement, Coinstar's argument regarding "bad faith" and "at least with full knowledge" are without any merits.

29. The parties have agreed to apply the SCC Rules on any dispute. According to the rules each party shall pay half of the Advance on Costs and SCC Institute has decided accordingly. During the initial procedure when SCC Institute had to decide the amount of the value in dispute Coinstar argued for a high value of the dispute and thereafter declared that it should only contribute with EUR 50 000 (not even corresponding to half of the Advance on Cost based solely on the claim for monetary damage). The arguments are Coinstar's own assessment of a material outcome of the dispute combined with unsubstantiated arguments of "bad faith" and "full knowledge". The division of the Advance on Costs shall not reflect the assessed material outcome of the dispute, but instead the contractual obligation to pay the relevant part of the Advance on Costs.

**IV Coinstar's  position**

30. Coinstar disputes that there is any basis for a separate award on costs. Coinstar has loyally contributed to the Advance on Costs decided by the Institute and has explained its decision why it has not contributed the full half of the amount based on Scan Coin's inflated claims

31. Coinstar's position is primarily based on the fact that it finds most of Scan Coin's claims to fall outside the scope of the arbitration agreement, and the arbitrators do not have jurisdiction over these claims. Coinstar refers to its application for summons, by which Coinstar has requested the District Court of Malmö to issue a declaratory judgment confirming that many of Scan Coin's claims in this arbitration fall outside the scope of the arbitration agreement, and to its other written submissions in those proceedings.

32. Further, the arbitration agreement, which was made in 1993, long before the introduction in the SCC Rules of any possibility to issue separate awards on advance payments of costs had been contemplated, does not permit the arbitrators to rule separately on such issues, absent a specific agreement between the parties. Coinstar refers to the Supreme Court decision NJA 2000 s. 773, which reflects the situation such as it was when the arbitration agreement was made. The Supreme Court held that a separate award such as now requested by Scan Coin cannot be obtained absent a specific agreement between the parties for a right of recourse that allows for such an award. Thus the rule referred to by Scan Coin does not apply

33. Hence, it is Coinstar's opinion that a separate award in the current situation is not allowed as a matter of Swedish law. The SCC rules or the revision of the rules will not alter that fact and certainly not with effect retroactively. The rule is not intended for the current situation. No authority, whether by precedence or the doctrine, suggests that it is.

34. In Coinstar's opinion, the rule is intended for the situation where one party refuses to loyally contribute to the advance payment of fees, without providing any viable reasons. The current situation is in fact the opposite.

35. With a view to the fact that Scan Coin's Request for Arbitration in this case has not been submitted in good faith or at least with full knowledge of the fact that the ma-

jority of Scan Coin's claims fall outside the scope of the arbitration agreement, it would be manifestly inappropriate for the arbitrators to give Scan Coin the benefit of a premature and separate award before any decision has been reached with respect to the issue on jurisdiction.

36. If jurisdiction for the arbitrators is found to exist, the same reasoning applies to a premature and separate award before any decision has been reached with respect to the remaining defences based on Coinstar's assertions of inadmissibility of claims based on the Agreement post termination and preclusion, as well as before review of the merits of the dispute.

37. In the event the arbitrators were to find that Swedish law allows a separate award in the current situation and that a specific agreement, as required by the reflected Supreme Court ruling, is at hand, or if the arbitrators were to find that the rule applies regardless of any specific agreement, Coinstar still objects to a separate award, and for the following reasons.

38. Scan Coin has decided to launch a massive attack against Coinstar, including a claim for transfer of ownership of practically all Coinstar's intellectual property rights. The claim is allegedly based on an agreement ("the Agreement") from 1993. The Agreement contains no language that would *prima facie* support the position that Coinstar has assigned its own intellectual property rights to Scan Coin.

39. The Agreement also contains nothing that would prevent Coinstar from engaging in development of its own, much less any language that would suggest that, if it did engage in development of its own, whether it resulted in intellectual property or not, the result would vest in or belong to Scan Coin.

40. The conclusion of a closer look at and a systematic interpretation of the Agreement is consistent with a *prima facie* review. Scan Coin's proposition is far fetched and based on an interpretation more or less *e contrario* that defies logic and common business sense. In their submissions, the parties have described the nature of their cooperation in some detail. Despite some inconsistencies and despite numerous disputed facts, it is thus clear and undisputed that the cooperation has been for Scan Coin's manufacturing and sale to Coinstar of a specific part, a CAM, to be jointly

developed and used by Coinstar to cause certain functionality in the coin deposite machine, the Machine, developed and owned by Coinstar.

41. With this in mind, Scan Coin's proposition that it enjoys title to Coinstar's development including every patent concerning the Machine, obviously owned by Coinstar, to which the majority of the patents concerned relate, is neither likely nor credible and moreover, again, not supported by any language whatsoever in the Agreement. Scan Coin has failed to establish even probable cause.

42. A "Separate Award" as contemplated by Article 45 of the Rules is in fact an Interim Award. This is obvious from the fact that the Separate Award does not finally adjudicate the subject matter between the parties. But the Separate Award is in fact also something else and something more.

43. An Interim Award or an Interim Ruling is as a general rule not enforceable in Sweden beyond creating collateral security, at least not for monetary performance. Monetary performance beyond providing collateral or security requires a Final Award or a Final Judgment and also that the time for an appeal has lapsed.

44. In Coinstar's view this means that not even probable cause is enough for creating a binding obligation on the part of Coinstar to make a monetary performance on an interim basis. Something else and something more is required.

45. Coinstar has challenged the arbitration agreement and has instigated proceedings in court and seeks a declaration that the arbitration agreement does not apply to the claims for transfer of ownership of intellectual property. The case is pending and Coinstar has filed its statement of evidence with the court.

46. Coinstar is of the firm view that the Agreement sets the boundaries for the application of the arbitration agreement. The Agreement, for the manufacturing and sale of the Product, does not extend to Coinstar's independent development and accrued intellectual property rights related to the Machine, unless the Agreement says so. The Agreement does not and Scan Coin's claims in this regard are thus apparently outside the scope and application of the arbitration agreement.

47. In addition, Coinstar has *inter alia* pointed to the fact that the Agreement was terminated by Scan Coin in 1999 and that performance under a terminated agreement

cannot be sought as a matter of Swedish law. In addition, Coinstar has pointed to the fact that any claim of ownership over the majority of patents in question is precluded as a matter of Swedish law.

48. The high advance on fees decided by the Institute is caused primarily by Scan Coin's insistence to pursue the claim for transfer of all Coinstar's intellectual property rights. Already in its Answer to the Request for Arbitration Coinstar asserted that the claims Scan Coin intended to bring were considered frivolous by Coinstar and Coinstar had no intention of financing Scan Coin's case by contributing to an inflated advance payment resulting from Scan Coin's desire and decision to launch a full scale attack.

49. Coinstar is of the firm opinion that the main part of Scan Coin's claims are wholly unwarranted and only crafted for the purposes of putting undue pressure on Coinstar. Coinstar is under no obligation, under the arbitration agreement or under the applicable rules or otherwise to accept Scan Coin's overreaching and pay one half of an advance payment based on any amount in dispute Scan Coin decides to put on the table.

50. The application of the rule referred to by Scan Coin must follow some objective criteria. The rule was not designed to allow a claimant the benefit of asserting any claim against a defendant and requiring that it pays half of any advance on fees or else risk a separate award against it. This is clear from the mere fact that such rule could and hence would be abused by a financially stronger party. By asserting an inflated claim and thus causing the advance on fees to the substantial and by arbitrators' assistance in granting a separate award for half of that amount, a weaker party would be forced to give up.

51. According to its wording, the rule in Article 45 is facultative. In Coinstar's opinion, the rule should thus be applied with caution and only in cases where no viable, argument for the refusal to contribute fully to the advance on fees is made. According to the Institute, no such separate award as now requested has been rendered since the rule was introduced. However, now, as can be seen from the Institute's website one such award has been rendered on 13th February 2008. As far as Coinstar under-

stands, the rule was adopted for the purpose of putting pressure on the parties that refused to contribute at all to the advance on fees. It was not adopted for the purpose of refusing parties contributing albeit not fully, the benefit of doubt when viable arguments have been made.

52. A fundamental rule in litigation and in arbitration is that each party will have to face the consequences of its own decisions. A decision to bring a very high claim in litigation, where only a fraction of that claim is granted, will have severe consequences for the claimant in the allocation of costs. The same rule applies in arbitration.

53. The underlying principle should be considered when assessing a situation as the current. The underlying principle would suggest that a claimant will have to face the consequences, cost wise or otherwise, of his decisions.

54. Coinstar has contributed a substantial amount and, in its opinion, a fair share to the advance of fees. Coinstar has also established that it is committed to contribute diligently to the resolution of the case

## VI Reasons

55. The Agreement, in which the relevant arbitration clause is included, was entered into on 30th April 1993 and amended on 1st September1994 and 15th February 1995, i.e. many years before the current SCC Rules entered into force. When the Agreement was entered into, the SCC Rules in force were the Rules that had entered into force as of 1st January 1988 (**the 1988 SCC Rules**).

56. The 1988 SCC Rules were replaced by new rules which entered into force as of 1st April 1999 (**the 1999 SCC Rules**). The 1999 SCC Rules provide in their final provisions ("EFFECTIVENESS") as follows:

> "These Rules enter into force on 1 April 1999 and will replace the former Rules of the Arbitration Institute of the Stockholm Chamber of Commerce. These Rules will be applied to any arbitration commenced on or after this date, unless otherwise agreed by the parties."

57. The current SCC Rules, which replace the 1999 SCC Rules, provide in their final provisions ("ENTRY INTO FORCE"):

> "These Rules enter into force on 1 January 2007 and will replace the former Rules of the Arbitration Institute of the Stockholm Chamber of Commerce. These Rules will be applied to any arbitration commenced on or after 1 January 2007 unless otherwise agreed by the parties."

58. Article 4 of the SCC Rules provide:

> "The arbitration shall be deemed to commence on the date on which the Request for Arbitration is received by the SCC Institute."

59. In this arbitration the Request for Arbitration was received by the Institute on 10th April 2007. The arbitration has thus commenced on that date. Having regard to the provisions on entry into force in both the 1999 SCC Rules and the current SCC Rules it is plain that the latter rules apply to this arbitration.

60. Since the arbitration agreement was made in 1993 long before the introduction of any possibility to issue a separate award envisaged in Article 45 (4) of the SCC Rules, Coinstar contends that the Tribunal is not permitted to issue a separate award such as now requested by Scan Coin, absent a specific agreement between the parties. In support of this contention Scan Coin refers to the Supreme Court decision NJA 2000 s.773 and to a legal opinion by Professor Bengt Lindell, in which the professor supports Coinstar's position.

61. Article 13 of the 1988 SCC Rules provides in paragraphs 1-3 as follows:

> "The Institute shall fix a sum which shall be paid to the Institute and which, together with accrued interest, shall constitute security for the costs of the proceedings. The amount thereof is fixed in accordance with regulations issued by the Institute. The Institute may fix separate sums for a counterclaim and a plea by way of set-off. After notification by the arbitral tribunal the Institute may in the course of the proceedings decide to increase the sums to be paid.
>
> Each party shall as a rule contribute half of such sums of money as are referred to in the preceding paragraph. One party may, however, pay the entire sum.
>
> If a party fails to make a required payment the Institute shall afford the other party an opportunity to do so. If, this notwithstanding, the required payment is not made, the case shall be wholly or partly dismissed or stayed."

62. Article 14 (2) and (3) of the 1999 SCC Rules provide:

> "(2) Each party shall contribute half of the Advance on Costs. The SCC Institute may fix separate amounts for counterclaims and set-off claims. After notification by the Arbitral Tribunal, the SCC Institute may, in the course of the proceedings, decide that additional amounts are to be paid.
>
> (3) If a party fails to make a required payment, the SCC Institute shall afford the other party an opportunity to do so within a specified period of time. If the required payment is not made, the case shall be dismissed either wholly or partly to such extent as is attributable to the missing payment."

63. Neither the 1988 SCC Rules nor the 1999 SCC Rules provided for a possibility for the Tribunal, at the request of a party, to make a separate award for reimbursement of advance payment if the other party had not paid its share of the required advance payment.

64. The Supreme Court decision NJA 2000 s.773, referred to by Coinstar, relates to an arbitration in which the arbitrators had determined the advance and had decided that each party shall contribute half of the required Advance on Costs. In that case the applicable law to the arbitration was the now abolished arbitration act, *Lag om skiljemän*, of 1929 which did not contain any express powers of the arbitrators to request security for their costs from the parties, and the arbitration was not conducted under any SCC Rules or any other institutional rules containing an obligation of the parties to pay an Advance on Costs. Since one of the two parties (B) refused to make the required payment, the other party (A) sued B in court and requested the court to order B to pay its share of the advance. The Supreme Court held that a party who had paid the required Advance on Costs in full had no right during an ongoing arbitration to require the other party to pay him an amount corresponding to its share of the Advance on Costs, unless the parties have so agreed.

65. As to the issue now before the Tribunal, the only relevant conclusion that can be drawn from the Supreme Court decision in question is that a party, who has paid an Advance on Costs also on the other party's behalf has no right during an ongoing arbitration to get reimbursement from the other party of the amount corresponding to the amount it has paid on the other party's behalf as an Advance on Costs, unless

the parties have so agreed, and that where there is such an agreement there is also a right of recourse which can be subject to a separate award. The question is then if in the present case there is such an agreement, and more particularly, if the SCC Rules contain such an agreement.

66. The Tribunal notes that the 1988 SCC Rules, which were in force when the Agreement was entered into, provided that the Institute shall fix a sum which shall be paid to the Institute and which, together with accrued interest, shall constitute security for costs of the proceedings and that each party shall as a rule contribute half of such sums of money. This obligation for each party existed also under the 1999 SCC Rules.

67. Thus by reference to the SCC 1988 Rules an obligation for each party to contribute to an Advance on Costs existed already when the arbitration agreement was entered into. The Tribunal does not find it relevant in this context that the 1988 SCC Rules, unlike the 1999 SCC Rules and the current SCC Rules, allowed the Institute in exceptional circumstances to deviate from the rule that each party shall pay half of the Advance of Costs.

68. Only the powers of the Arbitral Tribunal, at the request of a party, to make a separate award for the reimbursement of what that party has paid on the other party's behalf of the Advance of Costs is a novelty that did not exist under the earlier versions of the SCC Rules, .although the power as such to render separate awards, existed also before. This provision is of procedural nature and has not changed the substantive obligation of the parties to contribute to the Advance on Costs found already in Article 13 of the 1988 SCC Rules and also in the corresponding articles of the subsequent SCC Rules. It only provides a means for a party who has in whole or in part paid the other party's share of the Advance on Costs to get reimbursed before the final award has been rendered. Therefore, and since the current SCC Rules, unless otherwise agreed by the parties, apply to any arbitration under the Arbitration Rules of the Institute commenced after 1st January 2007, the Tribunal finds that it has the powers to make a separate award for the reimbursement of what a party has paid on behalf of the other party of the Advance on Costs.

69. The obligation for each party to pay half of the Advance on Costs is not affected by the possibility that the Claimant's claims or some of its claims may fall outside the scope of the arbitration agreement or of the possibility that the claims may be unfounded. The Advance on Costs shall be fixed and paid already before the case is referred to the Arbitral Tribunal.

70. As Coinstar points out, the Arbitral Tribunal has a discretionary power, whether or not to grant a separate award pursuant to Article 45 (4) of the SCC Rules. Even though there may be cases where a separate award on the Advance on Cost should not be made, e.g. where the party, who has failed to pay, has made a jurisdictional objection that is already at the outset obviously well founded, or when it already at the outset is clear that the other party's claims are manifestly unfounded. The Tribunal does not find any such reasons in the present case. Coinstar shall therefore be ordered to make the requested reimbursement.

For the reasons set out above, the Tribunal unanimously makes the following:

## VII DECISION

Coinstar Inc.is ordered to pay forthwith to Scan Coin Industries AB the sum of EUR 156 800 and interest thereon according to section 6 of the Swedish Interest Act from the 6th July 2007  until payment has been made in full.

Scan Coin's request for reimbursement of its cost in relation to its request for this separate award will be dealt with in the final award.

Tore Wiwen-Nilsson                    Gustaf Möller                    Ulf Dahlgren

08CV3028   EDA
JUDGE NORGLE
MAGISTRATE JUDGE NOLAN

# EXHIBIT C

## Nilsson Daniel

| | |
|---|---|
| **Från:** | Perborn Anders |
| **Skickat:** | den 12 maj 2008 18:27 |
| **Till:** | Benedictsson, Jonas |
| **Kopia:** | Olsson Lennart; Nilsson Daniel |
| **Ämne:** | SCAN CION v/s Coinstar |

Dear Jonas,

With reference to the Arbitral Tribunal's separate award on costs made in Malmö on 8 May 2008 SCAN COIN hereby requests that Coinstar executes the ordered payment of € 156 800 plus accumulated interest.

The payment shall be made to Wistrand Advokatbyrå's client account at Nordea
SWIFT/BIC NDEASESS,
IBAN SE69 3000 0000 0303 0171 2077.

The payment should be received by Wistrand Advokatbyrå not later than 19 May 2008. The accumulated interest as of 19 May 2008 amounts to € 16 030.

If Wistrand Advokatbyrå has not received the payment by 19 May 2008 SCAN COIN may find it necessary to take further legal actions for the payment of the ordered amount.

Kind regards

Anders perborn

## WISTRAND

Anders Perborn
Advokat
Wistrand Advokatbyrå
Box4149
Södergatan 22
SE-203 12, Malmö
Sweden
Telephone: +46 40 669 71 00/02
Mobile: +46 706 31 33 01
Fax: +46 40 669 71 01
anders.perborn@wistrand.se
www.wistrand.se